***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. American Home Assurance is the carrier on risk.
3. An employee-employer relationship existed between the parties at all relevant times.
4. The onset date of the alleged occupational disease is April 17, 1999.
5. The nature of the alleged occupational disease is repetitive motion injury-carpal tunnel syndrome.
6. Plaintiff's average weekly wage was $437.33, yielding a compensation rate of $291.57.
7. Plaintiff is claiming temporary total disability from April 17, 1999 to July 21, 1999, plus one week in August 1999, and five percent permanent partial disability to each of her hands.
8. The issues for determination are:
 a. Did plaintiff suffer a compensable occupational disease to wit: carpal tunnel syndrome as a result of her employment with employer?
 b. If so, what amount is plaintiff entitled to recover for temporary total compensation, medical treatment and permanent partial disability?
9. The following documents were admitted into evidence as stipulated exhibits:
 a. The parties' Pre-Trial Agreement was admitted as stipulated exhibit 1. The Pre-Trial Agreement is incorporated herein by reference in its entirety.
 b. A set of medical records was admitted as stipulated exhibit 2.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. In February 1999, plaintiff began working as a fork lift driver in defendant-employer's distribution facility. Defendant-employer referred to plaintiff's job as that of "P.E. driver" which stood for power equipment driver.
2. Plaintiff's job consisted of driving the fork lift around defendant-employer's large distribution facility to pick-up, transport, and drop-off merchandise.
3. To drive the fork lift, the operator is in a standing position. The steering column of the fork lift contains a power grip much like those on motorcycles. The power grip is gripped with one hand and rotated forward to make the fork lift accelerate and backward to slow it down or stop it. The fork lift will also slow if the operator releases the power grip. The operator's other hand is used to grip the rear support bar to maintain stability and to press the "rabbit button" for added acceleration.
4. Plaintiff's shift consisted of working three consecutive days per week, twelve hours per day. On occasion, she worked a fourth consecutive twelve hour day. During her twelve hour shifts, plaintiff was required to frequently use repetitive hand action to accelerate, slow, and stop her fork lift in order to navigate the distribution facility. Defendant-employer's own description of the job stated "repetitive hand action" was "frequent," which was defined as repetitive hand action up to 66% of the time. In addition, there was significant vibration while operating the fork lift.
5. Prior to working for defendant-employer, plaintiff had not experienced pain in her hands, wrists, or forearms.
6. Plaintiff saw Dr. Bradford K. Faulkenberry, her family doctor, on April 12, 1999 complaining of numbness and tingling in her hands and pain radiating into her arms. Dr. Faulkenberry diagnosed plaintiff with early carpal tunnel syndrome and referred her to Dr. Paul F. Rush, an orthopedic surgeon. Dr. Faulkenberry recommended that plaintiff cease doing her job as a fork lift operator. Defendant-employer had no light duty work available, and thus sent plaintiff home from work on April 17, 1999. Plaintiff has not worked for defendant-employer since this date.
7. Dr. Rush treated plaintiff for carpal tunnel syndrome by recommending that she wear splints, take anti-inflammatory medication, and cease her repetitive hand activities at work. Dr. Rush released plaintiff to return to light duty work on June 14, 1999, but defendant-employer did not have light duty work available.
8. Plaintiff was out of work until on or about September 1999 when she returned to work assisting her husband with his long distance truck driving, the job she was doing prior to working for defendant-employer. Plaintiff received unemployment benefits for a portion of the time she was out of work. Pursuant to stipulation of the parties, plaintiff is claiming temporary total disability from April 17, 1999 through July 21, 1999, plus one week in August 1999.
9. Dr. Rush assigned plaintiff a five percent permanent partial disability rating to each hand.
10. Dr. Rush stated that there is a correlation between plaintiff's job with defendant-employer and her symptoms of carpal tunnel syndrome. While Dr. Rush could not testify with absolute certainty that plaintiff's job caused her condition, he stated that plaintiff's job, at a minimum, "brought her symptoms to light and certainly was an aggravation of her median nerve function and her tendon function." Dr. Rush based his opinion on plaintiff's history, including her description of her job, his physical findings, electrodiagnostic studies, and plaintiff's response to treatment. Dr. Rush further testified that he was familiar with the type of fork lift plaintiff operated as he had seen them while touring plants. Finally, Dr. Rush testified that plaintiff's job put her at a greater risk than the general public to develop carpal tunnel syndrome.
11. Al Gorrod, a certified ergonomic evaluator, was hired by defendants to conduct an ergonomic evaluation of the fork lift driver job. Mr. Gorrod stated that the job does not have any "adverse risk factors that would correlate with upper extremity cumulative trauma syndrome diagnoses and conditions." Mr. Gorrod testified that he never observed plaintiff operating the forklift and that he did not know how plaintiff performed the job. Mr. Gorrod's analysis was based upon "the average person doing the work." Dr. Rush, in discussing the ergonomic analysis, testified that he believed plaintiff's "size is a factor here: her small hand and how much she had to grip versus somebody, say, a man, a large body . . . but we're talking about individuals. And obviously, she brings to the table some different anatomy . . . than these people he (Mr. Gorrod) tested." Dr. Rush further stated that Mr. Gorrod's analysis "would be a more accurate reflection if it was done on the patient."
12. The Commission gives greater weight to the opinion of Dr. Rush, plaintiff's treating physician, than to the opinion of Mr. Gorrod who did not observe plaintiff performing the job. The competent evidence of record shows that plaintiff's employment with defendant-employer exposed her to a greater risk of contracting carpal tunnel syndrome than members of the general public, and that plaintiff's employment with defendant-employer significantly contributed to, or was a significant causal factor in, the development of the disease.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's employment with defendant-employer exposed her to a greater risk of contracting carpal tunnel syndrome than members of the general public, and plaintiff's employment with defendant-employer significantly contributed to, or was a significant causal factor in, the development of the disease. N.C. Gen Stat § 97-53(13); Rutledge v.Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983); Hardin v. MotorPanels, Inc., 136 N.C. App. 351, 524 S.E.2d 368 (2000).
2. The Supreme Court has held that expert medical opinion based on speculation and conjecture is not competent evidence on issues of medical causation. Young v. Hickory Business Furniture, 353 N.C. 227,538 S.E.2d 912 (2000). Dr. Rush's diagnosis and causation testimony is based on plaintiff's history, the doctor's physical findings, test results and plaintiff's response to treatment and was supported by Dr. Faulkenberry. Dr. Rush's opinion regarding the etiology of plaintiff's carpal tunnel syndrome is not based solely on supposition and conjecture and, therefore, can be distinguished from the Young decision.
3. As a result of the compensable occupational disease, plaintiff is entitled to temporary total disability compensation at the rate of $291.57 per week for the period from April 17, 1999 through July 21, 1999, plus one week in August 1999. N.C. Gen. Stat. § 97-29.
4. If plaintiff received unemployment benefits which were not considered by the parties in arriving at the stipulated temporary total disability being claimed, defendants are entitled to any additional credit. N.C. Gen. Stat. § 97-42.1.
5. Plaintiff is entitled to permanent partial disability compensation at the rate of $291.57 per week for twenty weeks as a result of the five percent rating to her right hand and the five percent rating to her left hand. N.C. Gen. Stat. § 97-31(12).
6. Plaintiff is entitled to have defendants pay all medical expenses incurred or to be incurred as a result of the compensable occupational disease as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
AWARD
1. Subject to the attorney's fee approved below and any additional credit owed defendants for unemployment benefits received by plaintiff, defendants shall pay temporary total disability compensation to plaintiff at the rate of $291.57 per week for the period from April 17, 1999 through July 21, 1999, plus one week in August 1999. This amount has accrued and shall be paid in a lump sum.
2. Subject to the attorney's fee approved below, defendants shall pay permanent partial disability compensation at the rate of $291.57 per week for twenty weeks for plaintiff's permanent partial disability rating.
3. A reasonable attorney's fee of twenty-five percent of the compensation awarded to plaintiff in paragraphs one and two above is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
4. Defendants shall pay medical expenses incurred or to be incurred for treatment of plaintiff's occupational disease, when bills for the same have been approved, in accordance with the provisions of the Act.
5. Defendants shall pay the costs.
This the ______ day of March 2002.
 S/_______________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BUCK LATTIMORE CHAIRMAN
 S/__________________ C. RIGGSBEE COMMISSIONER
LKM/mhb